# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL NO. 227, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF AGRICULTURE,<br><br>Defendant. | Civil Action No. 1:20-cv-2045-TJK |

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Nandan M. Joshi (DC Bar No. 456750)
Adam R. Pulver (DC Bar. No. 1020475)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Sarai K. King
United Food & Commercial Workers
International Union, AFL-CIO, CLC
1775 K Street, NW
Washington, DC 20006-1598
(202) 223-3111

*Counsel for Plaintiffs*

Dated: November 13, 2020

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 2

LEGAL STANDARDS ................................................................................................ 12

ARGUMENT .............................................................................................................. 13

    I.      UFCW has adequately established Article III standing. .................................... 13

    II.    UFCW was not required to identify an individual member with Article III
          standing in the complaint. ............................................................................. 20

    III.   UFCW falls with the zone of interests of the statutory scheme. ..................... 23

CONCLUSION ........................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*American Bar Ass'n v. United States Department of Education*,
370 F. Supp. 3d 1 (D.D.C. 2019) ............................................................... 23

*American Chemistry Council v. Department of Transportation*,
468 F.3d 810 (D.C. Cir. 2006) .................................................................. 22

*American Federation of Government Employees v. Office of Personnel Management*,
618 F. Supp. 2d 1254, 1259 (D.D.C. 1985),
*aff'd,* 782 F.2d 278 (D.C. Cir. 1986) ........................................................ 22

*American Trucking Ass'ns, Inc. v. Federal Motor Carrier Safety Administration*,
724 F.3d 243 (D.C. Cir. 2013) ............................................................ 14, 18

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017) ................................................ 12, 14, 15, 18

*Center for Biological Diversity v. Bernhardt*,
442 F. Supp. 3d 97 (D.D.C. 2020) ............................................................ 13

*Chamber of Commerce. v. EPA*,
642 F.3d 192 (D.C. Cir. 2011) .................................................................. 22

*Chesapeake Climate Action Network v. Export-Import Bank of the United States*,
78 F. Supp. 3d 208 (D.D.C. 2015) ............................................................ 21

*Clarke v. Securities Industry Ass'n*,
479 U.S. 388 (1987) .................................................................................. 23

*Delaware Riverkeeper Network v. FERC*,
243 F. Supp. 3d 141 (D.D.C. 2017) ............................................................ 2

*Department of Commerce v. New York*,
139 S. Ct. 2551 (2019) ........................................................................ 13, 14

*Doe v. Stincer*,
175 F.3d 879 (11th Cir. 1999) .................................................................. 21

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ................................................ 15, 16, 17, 18

*Frank v. Autovest, LLC*,
961 F.3d 1185 (D.C. Cir. 2020) ................................................................ 12

*Hughes v. Rowe*,
  449 U.S. 5 (1980) ........................................................................................... 21

*Hunt v. Washington State Apple Advertising Commission*,
  432 U.S. 333 (1977) ....................................................................................... 20

*Indian River County v. Department of Transportation*,
  945 F.3d 515 (D.C. Cir. 2019) ....................................................................... 24

*Jerome Stevens Pharmaceuticals, Inc. v. FDA*,
  402 F.3d 1249 (D.C. Cir. 2005) ..................................................................... 12

*Levine v. Johanns*, No. C 05-04764 MHP,
  2006 WL 8441742 (N.D. Cal. Sept. 6, 2006) ................................................ 24

*Lexmark International, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118, 130 (2014) .......................................................................... 23, 25

*Louisiana Environmental Action Network v. EPA*,
  172 F.3d 65 (D.C. Cir. 1999) ......................................................................... 19

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ....................................................................................... 12

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ....................................................................................... 23

*National Credit Union Administration v. First National Bank & Trust Co.*,
  522 U.S. 479 (1998) ....................................................................................... 23

*National Treasury Employees Union v. Whipple*,
  636 F. Supp. 2d 63 (D.D.C. 2009) ................................................................. 21

*Natural Resources Defense Council v. EPA*,
  464 F.3d 1 (D.C. Cir. 2006) ............................................................... 13, 19, 22

*New York Republican State Committee v. SEC*,
  927 F.3d 499 (D.C. Cir. 2019) ....................................................... 14, 15, 16, 18

*New York v. Trump*, No. 20-CV-5770 (RCW) (PWH) (JMF),
  2020 WL 5422959 (S.D.N.Y. Sept. 10, 2020) ............................................... 19

*Public Citizen Health Research Group v. Acosta*,
  363 F. Supp. 3d 1 (D.D.C. 2018) ................................................................... 13

*Public Citizen, Inc. v. National Highway Traffic Safety Administraton*, 489 F.3d
  1279 (D.C. Cir. 2007) ............................................................................... 13, 15

*Renal Physicians Ass'n v. U.S. Department of Health & Human Services*,
    489 F.3d 1267 (D.C. Cir. 2007) ........................................................................ 18

*Spokeo v. Robins*,
    136 S. Ct. 1540 (2016) ..................................................................................... 13

*Twin Rivers Paper Co. v. SEC*,
    934 F.3d 607 (D.C. Cir. 2019) ................................................................... 25, 26

*United Food & Commercial Workers Local 751 v. Brown Group, Inc.*,
    517 U.S. 544 (1996) ................................................................................... 20, 26

*United Food & Commercial Workers Union, Local No. 663 v. United States Department of Agriculture*,
    451 F. Supp. 3d 1040 (D. Minn. Apr. 1, 2020) .............................................. 24

*Washington Alliance of Technology Workers v. United States Department of Homeland Security*,
    892 F.3d 332 (D.C. Cir. 2018) ........................................................................ 21

*WildEarth Guardians v. Zinke*,
    368 F. Supp. 3d 41 (D.D.C. 2019) ................................................................. 21

**Statutes**

Poultry Products Inspection Act

    21 U.S.C. § 451 *et seq.* ..................................................................................... 6

    21 U.S.C. § 452 .................................................................................................. 6

    21 U.S.C. § 459(a) ............................................................................................. 6

29 U.S.C. § 654(a) .................................................................................................. 8

**Regulations**

9 C.F.R. § 381.67 .................................................................................................... 6

9 C.F.R. § 381.67(a) ............................................................................................... 7

9 C.F.R. § 381.69 .................................................................................................... 6

9 C.F.R. § 381.76(b)(1) .......................................................................................... 6

9 C.F.R. § 381.76(b)(3)(ii)(*b*) ............................................................................... 6

9 C.F.R. § 381.76(b)(4)(iv) .................................................................................... 6

**Federal Register**

Final Rule, Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. 49,565
(Aug. 21, 2014) ................................................................................................. passim

Irradiation of Meat Food Products, 64 Fed. Reg. 72,150 (Dec. 23, 1999) ................................... 25

Notice, Extension of Comment Period, Modernization of Poultry Slaughter
Inspection, 77 Fed. Reg. 24,873 (Apr. 26, 2012) ....................................................... 7

Notice, Petition To Permit Waivers of Maximum Line Speeds for Young Chicken
Establishments Operating Under the New Poultry Inspection System; Criteria
for Consideration of Waiver Requests for Young Chicken, Establishments To
Operate at Line Speeds of Up to 175 Birds per Minute, 83 Fed. Reg. 49,048
(Sept. 28, 2018) ............................................................................................. 9, 15

Pathogen Reduction; Hazard Analysis and Critical Control Point (HACCP)
Systems, 61 Fed. Reg. 38,806 (July 25, 1996) ........................................................ 24

Pathogen Reduction; Hazard Analysis and Critical Control Point (HACCP)
Systems—Sample Collection— Technical Amendments and Corrections:
Direct Final Rule, 62 Fed. Reg. 61,007 (Nov. 14, 1997) .......................................... 25

Proposed Rule, Modernization of Poultry Slaughter Inspection, 77 Fed. Reg. 4407
(Apr. 26, 2012) .......................................................................................... 7, 8, 24

**Other**

*Poultry Products Inspection Act: Hearing on S. 313, S. 645, and S. 1128 Before
the S. Comm. on Agriculture and Forestry*, 85th Cong. (1957) .............................................. 25

## INTRODUCTION

Plaintiffs United Food and Commercial Workers Union, Local No. 227, et al. (collectively, UFCW) are unions that represent workers in various poultry processing plants throughout the United States. UFCW represents almost all of the workers on the poultry processing line who perform manual labor to turn live chickens into food product safe for human consumption. Because this work is repetitive and dangerous, poultry workers are far more likely than the average industrial worker to suffer acute injuries such as amputations and lacerations, and chronic ailments such as carpal tunnel syndrome. The speed of the processing lines is widely recognized by the scientific community as a major contributing factor to the high injury rate for poultry workers. Indeed, when defendant United States Department of Agriculture (USDA) last examined poultry line speeds in 2014, its Food Safety and Inspection Service (FSIS) decided *not* to increase the existing limits on line speeds after considering worker safety concerns, and explicitly acknowledged the evidence demonstrating the connection between line speed and worker safety.

In 2018, FSIS reversed course. Without commencing a new rulemaking and without considering worker safety, FSIS created a new "waiver" regime that allows plants to exceed by 25 percent the line-speed limit set by regulation. Several plants where UFCW is the exclusive collective bargaining representative have received waivers under the new policy. Workers on the lines in those plants are now at a higher risk of injury than if their employers remained subject to the maximum line speed established by the agency's regulations.

To protect the workers it represents from safety risks associated with faster line speeds, UFCW brought this action against the USDA for failing to engage in reasoned decisionmaking in adopting its waiver program, for implementing its "new technology" waiver regulation unlawfully, and for contravening notice-and-comment requirements in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2). Although UDSA has moved to dismiss UFCW's claims

for lack of standing and under the zone-of-interests test, the complaint properly alleges Article III standing, and the additional evidence submitted with this opposition confirms that USDA's waiver program substantially increases the risk of harm to poultry workers UFCW represents. In addition, as USDA has repeatedly recognized through its regulatory actions, the worker safety concerns that UFCW raises easily fall within the zone of interests of the statutory scheme. USDA's motion to dismiss should be denied.

## BACKGROUND

**The Impact of Line Speed on Worker Injuries in Poultry Plants**

Bringing poultry products to the American consumer requires grueling manual labor by thousands of UFCW-represented poultry workers who work "on the line." Compl. (ECF 1) ¶¶ 9–18. The "line" refers to the conveyance of chickens through a plant to transform them from live birds to food product. *Id.* ¶ 18; Lauritsen Decl. ¶¶ 14–19.[1] At the beginning of the process, workers manually take live chickens that have been delivered to the plant and hang them upside down from a conveyer; the birds are then killed, defeathered, eviscerated, washed, chilled, deboned, and packaged for delivery. *See id.* ¶¶ 16–18; Joshi Decl., Ex. A (2016 GAO Report), at 7; Lauritsen Decl. ¶¶ 14–19. As certain tasks have been automated, poultry processing plants have increased the speeds at which they run the lines. Joshi Decl., Ex. A (2016 GAO Report), at 29 & n.67. Plants still rely on workers, however, to perform many tasks. Compl. (ECF 1) ¶ 17; Joshi Decl., Ex. A (2016 GAO Report), at 6.

The physical demands of processing poultry take a toll on workers. The poultry industry is the fourteenth most dangerous industry for workers nationwide: An average of eight poultry

---

[1] "[U]nder Rule 12(b)(1), the court 'is not limited to the allegations of the complaint,'" and 'a court may consider such materials outside the pleadings as it deems appropriate." *Del. Riverkeeper Network v. FERC*, 243 F. Supp. 3d 141, 147 (D.D.C. 2017) (citations omitted).

workers died every year in one four-year period, poultry workers face double the rate of amputations as the average worker in private industry, and injuries such as sprains, lacerations, and contusions are common among poultry workers. Compl. (ECF 1) ¶ 21; *see also* Joshi Decl., Ex. B (OSHA Regional Instruction), at 4 & Ex. C (HRW Report), at 30 & n.66. Many of these injuries arise because workers on the line are required to stand close together using saws, knives, and other tools to cut up, debone, and otherwise prepare chicken carcasses in an environment coated with grease and blood, and must do so quickly enough to keep up with the speed at which the birds are being conveyed down the line. Compl. (ECF 1) ¶ 18; Joshi Decl., Ex. D, at 1 (OSHA Cuts & Lacerations Webpage) (observing that cuts and lacerations, which "account for about 10% of injuries in the poultry processing industry," are caused by workplace conditions such as "[e]mployees working too close together" and "[p]iecework incentive programs encouraging employees to work faster, often at the expense of working safely"); Joshi Decl., Ex. E (Oxfam Report), at 25 ("One survey found that 17 percent of workers performing deboning, cutting, and trimming had suffered a cut serious enough to require medical attention.").

Poultry workers also commonly suffer from musculoskeletal disorders—such as carpal tunnel syndrome (CTS), tendonitis, and "trigger finger." Compl. (ECF 1) ¶ 20. Based on a 1997 survey, the Occupational Health and Safety Administration (OSHA) estimates that musculoskeletal disorders account for approximately half of injuries among poultry workers. Joshi Decl., Ex. F (OSHA Ergonomics Webpage), at 1. These disorders are a direct result of the thousands of rapid, forceful, and repetitive movements that poultry workers must make to hang, cut, debone, and prepare chicken carcasses as they move down the line. Compl. (ECF 1) ¶ 20; *see also* Fagan Decl., Ex. B, at 1–3. "Most all jobs in poultry processing involve highly repetitive tasks—repeating the same motions over and over again at a fast past with little variation in the

tasks." Joshi Decl., Ex. F (OSHA Ergonomics Webpage), at 1. For example, live hanging can require a worker to lift live birds up to 25 times per minute, "[a] single employee may be required to process hundreds of gizzards every hour," and "[c]utting and trimming tasks often require 6 to 10 scissor or knife cuts per minute." Joshi Decl., Ex. F (OSHA Ergonomics Webpage), at 1. OSHA has observed, for example, that the carpal tunnel syndrome rate for poultry workers in 2017 was 4.3 times higher than for workers in all of private industry (Compl. (ECF 1) ¶ 20 (citing Joshi Decl., Ex. B (OSHA Regional Instruction), at 2) and that, based on 2013 data, poultry workers were "4.5 times more likely" than the average industry worker "to identify repetitive motion as the exposure resulting in a serious injury," *id.* (quoting Joshi Decl., Ex. G (Galassi Memo), at 2).

The scientific literature, and on-the-ground experiences of workers, confirm that a "major contributing factor" to the high rate of injury among poultry line workers is the pace at which they must work. Compl. (ECF 1) ¶ 22 (quoting Joshi Decl., Ex. C (HRW Report), at 49 & nn.133 & 134 (citing studies)). As the Government Accountability Office (GAO) has observed, "[t]he speed at which production employees are expected to work" is "often determined by the … line speed," and "[t]he faster the pace at which the production line moves, the less able workers may be to perform tasks needed for safety." Joshi Decl., Ex. H (2005 GAO Report), at 31; *see also* Joshi Decl., Ex. E (Oxfam Report), at 24 ("Workers surveyed over the last several years report that the line speed is an enormous part of the reason that workers get injured."); Final Rule, Modernization of Poultry Slaughter Inspection, 79 Fed. Reg. 49,565, 49,698 (Aug. 21, 2014); Ramirez Decl. ¶ 7 (describing "knife slips" as a result of "working so quickly").

Research demonstrates that increases in line speed leads to an enhanced risk of musculoskeletal disorders in poultry workers. As the National Institute for Occupational Safety and Health (NIOSH) explained to FSIS in 2014, the risk of carpel tunnel syndrome for workers in

poultry processing plants arises from "the repetitive and forceful motions required by exposed workers to process poultry," and "[l]ine speed affects the periodicity of repetitive and forceful movements, which are the key causes of musculoskeletal disorders." Compl. (ECF 1) ¶ 23 (quoting Joshi Dec., Ex. I (NIOSH Letter), at 2–3). Indeed, as far back as 1988, NIOSH recommended that poultry plants reduce their line speeds to address the prevalence of musculoskeletal disorders among workers. Joshi Decl., Ex. J (Longmont Study), at 10 (recommending that a turkey plant "[d]ecrease line speeds" in departments with high injury rates "as much as is practically feasible"); *see also* Joshi Decl., Ex. K (Perdue Farms Study), at 18 (stating NIOSH's conclusion that "slowing down the main conveyer" would "reduce [cumulative trauma disorders] risk factors" among poultry workers); Joshi Decl. Ex. L (Cargill Study), at 14 (stating NIOSH's conclusion that "slowing down the main line" can reduce "highly repetitive movements" that cause cumulative trauma disorders).

Dr. Kathleen Fagan, MD, MPH, a former medical officer within the Office of Occupational Medicine and Nursing at OSHA, has synthesized extant research to describe in detail how line speed negatively effects worker safety. *See* Fagan Decl., Ex. B. As Dr. Fagan explains, "the speed of work translates to the number of repetitions of the same movements, i.e., job tasks, per unit of time," and this "[r]epetitive motion, particularly if accompanied by force, causes acute inflammation of the tissues." *Id.* at 1. "[C]ontinued task performance" with injured or inflamed tissue produces "a vicious cycle of injury," leading to various forms of musculoskeletal disorders. *Id.* Poultry processing work presents "major ergonomic hazards" such as "repetitive motion, force, awkward posture, vibration and cold temperatures," *id.* at 3, and repetitiveness is one of the key factors in elevating workers' musculoskeletal risk, *id.* at 1–2. Research confirms that poultry processing work is, in fact, associated with high levels of musculoskeletal injuries, and that poultry

workers are exposed to ergonomic risks that exceed thresholds that are "considered hazardous" by the American Conference of Governmental Industrial Hygienists (ACGIH). *Id.* at 3; *see also id*. at 4–5 (surveying research). The research shows that "[l]ine speeds in the poultry industry are a key ergonomic hazard linked to" musculoskeletal disorders, and that "[i]ncreasing line speeds, in the absence of effective ergonomic programs, will further increase the risk of [such disorders] and other injuries and illnesses for poultry work." *Id.* at 7; *see also* Joshi Decl., Ex. M (NIOSH Blog Post), at 1 (describing the musculoskeletal risks arising out of work conditions in poultry processing and recommending that plants reduce those risks by "[r]educ[ing] cone line speeds and us[ing] additional cone lines so that job tasks are below the action limit" developed by ACGIH.)

**NPIS and the 2014 Rulemaking**

USDA, through FSIS, regulates poultry line speeds pursuant to the Poultry Products Inspection Act (PPIA or Act), 21 U.S.C. § 451 *et seq*. The Act "provide[s] for the inspection of poultry and poultry products and otherwise regulate[s] the processing and distribution of such articles" to prevent the sale of "poultry products which are adulterated or misbranded," *id.* § 452, and prohibits plants from processing poultry products in a manner that does not comply with the Act's requirements, *id.* § 459(a).

FSIS regulations establish several types of inspection systems for different types of poultry plants and set a maximum line speed for each system. 9 C.F.R. §§ 381.67, 381.69, 381.76(b)(1), 381.76(b)(3)(ii)(*b*), 381.76(b)(4)(iv). The maximum line speed, measured in "birds per minute" (or bpm), "reflect[s] the time it takes for an inspector to effectively perform the online carcass inspection procedures." *See* Final Rule, 79 Fed. Reg. at 49,567. FSIS inspectors inspect birds after they are eviscerated and before they are chilled, deboned, and packaged. *Id*. at 49,590.

The line speed limit at the inspection station helps to act as a brake on the pace of the work throughout the poultry processing line because "work pace in processing departments is influenced by inspection line speed." Final Rule, 79 Fed. Reg. at 49,598. As Mark Lauritsen, UFCW's International Vice President for Meatpacking, explains, "[e]visceration line speeds affect the pace of production and work in the entire processing plant." Lauritsen Decl. ¶ 13. Specifically, "[b]ecause the birds move continuously throughout the plant, evisceration line speeds affect the flow of product throughout the plant," *id.* ¶ 20, and "affect[] the work pace throughout the plant," including workers who process birds after inspection such as "in the debone area," *id.* ¶ 21; *see also* Joshi Decl., Ex. C (HRW Report), at 63 ("The testimony of workers who spoke with Human Rights Watch, however, indicates that line speeds in different departments, even those separated by full stops in processing, such as the freezer, remain closely related.").

In 2014, FSIS adopted a rule creating the New Poultry Inspection System (NPIS). Under NPIS, plants—including the plants at issue in this case—cannot exceed a line speed of 140 bpm. 9 C.F.R. § 381.67(a). Throughout the notice-and-comment rulemaking process, FSIS recognized that the maximum line speed that it would establish for the NPIS inspections would have an effect on the safety of poultry plant workers, and it took worker safety into account in establishing the rule. *See* Proposed Rule, Modernization of Poultry Slaughter Inspection, 77 Fed. Reg. 4407, 4423 (Jan. 27, 2012) ("FSIS recognizes that evaluation of the effects of line speed on food safety should include the effects of line speed on establishment employee safety."); Notice, Extension of Comment Period, Modernization of Poultry Slaughter Inspection, 77 Fed. Reg. 24,873, 24,875 (Apr. 26, 2012) (explaining that FSIS had "consider[ed] the potential effects on [worker] safety" and that it was "interested in comments on the effects of line speed and worker safety").

FSIS initially proposed setting the maximum line speed at NPIS plants at 175 bpm, *see* Proposed Rule, 77 Fed. Reg. at 4423, but it received extensive comments from groups who "were concerned that an increase in production line speed would lead to increased rates of musculoskeletal disorders, other traumatic injuries, and potentially adverse health effects of psychological and emotional stress among industry workers, particularly in processing jobs involving highly repetitive knife use." Final Rule, 79 Fed. Reg. at 49,598. In response, FSIS acknowledged that "[i]ncreasing line speed in processing, without changing other factors, could result in an increase of work pace for establishment employees," which, in turn, could, "increase risk of injuries and illnesses among establishment employees." *Id.* In the end, FSIS did not adopt the 175 bpm maximum line speed it had proposed, but rather capped the line speed at 140 bpm. *See* Final Rule, 79 Fed. Reg. at 49,591.

FSIS's Final Rule addressed worker safety concerns in two additional ways. First, FSIS "establish[ed] a new subpart" that requires poultry establishments to attest that they "maintain[] a program to monitor and document any work-related conditions that arise among establishment workers." *Id.* at 49,600. Second, FSIS revised its regulations to provide that NPIS establishments must "comply with all other applicable requirements of the law," *id.*, including, specifically, 29 U.S.C. § 654(a), which requires each employer to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." FSIS also promised that it would "consider the available data on employee effects collected from NIOSH activities when implementing the final rule." *Id.* at 49,596.

**FSIS's New Waiver System**

In September 2017, an industry trade group filed a petition to institute a waiver program that would eliminate line speed limits for waiver recipients. Compl. (ECF 1) ¶ 41. FSIS denied that petition, stating that it would instead "make available criteria that it will use to consider waiver requests from young chicken establishments … to operate at line speeds of up to 175 bpm." *Id*. ¶ 45 (quoting Joshi Decl., Ex. N (FSIS Denial Letter), at 2). Shortly after, in 2018, without undertaking notice-and-comment rulemaking procedures, FSIS created a new waiver program (the 2018 Waiver Program). Under the 2018 Waiver Program, NPIS plants can apply for waivers allowing them to operate poultry lines at up to 175 bpm. *See* Compl. (ECF 1) ¶¶ 41–46; *see also* Joshi Decl., Ex. O (2018 Constituent Update), at 1; Notice, Petition To Permit Waivers of Maximum Line Speeds for Young Chicken Establishments Operating Under the New Poultry Inspection System; Criteria for Consideration of Waiver Requests for Young Chicken, Establishments To Operate at Line Speeds of Up to 175 Birds per Minute, 83 Fed. Reg. 49,048 (Sept. 28, 2018) (2018 Waiver Notice). FSIS justified the 2018 Waiver Program under a FSIS regulation that authorizes waivers for poultry plants to try out new technologies that could facilitate "definite improvements." *See* Compl. (ECF 1) ¶ 53; *see also* 9 C.F.R. § 381.3(b).

In creating the 2018 Waiver Program, FSIS ignored the risks that faster line speeds pose to the safety of workers on the poultry line. Compl. (ECF 1) ¶ 56. Although a plant receiving a waiver will "routinely need to operate at least one line at speeds above 140 bpm on average," the Waiver Program does not require plants to take any steps to protect workers from the health and safety risks associated with faster line speeds. *See* 2018 Waiver Notice, 83 Fed. Reg. at 49,051. FSIS's sole reference to worker safety was a statement that it "has neither the legal authority nor the expertise to regulate or enforce workplace standards for establishment employees." *Id.* at 49,057.

FSIS did not explain its decision to forgo waiver conditions to ameliorate the heightened risks to worker safety resulting from the mandatory increase in line speed. Compl. (ECF 1) ¶ 58. FSIS also did not attempt to reconcile its refusal to consider the effects of its actions on worker safety with its consideration of worker safety in prior rulemakings, including in the 2014 Final Rule.

At least ten plants where UFCW represents workers on the line applied for, and were granted, waivers. FSIS therefore allows those plants to operate above the 140 bpm maximum line speed stated in the regulation. *See* Compl. (ECF 1) ¶¶ 9–15. Although USDA has refused to include any information about these waivers in the administrative record (ECF 9-2), UFCW's believes, and its complaint has alleged, that none of the plants' waiver applications proposed to experiment with any new technology that requires increased line speeds and that the agency's grant of these waivers did not impose any conditions on plants that address the increased risk to worker safety that would result from an increase in line speed.  *See* Compl. (ECF 1) ¶¶ 65–72.

**Plaintiffs**

Plaintiff UFCW Local 227 represents approximately 1250 workers at the Tyson Foods poultry plants in Robards, Kentucky, and 300 workers at the plant in Corydon, Indiana, which received a line-speed waiver under the 2018 Waiver Policy in April 2020. Compl. (ECF 1) ¶ 9; Whiteley Decl. ¶ 3. UFCW Local 227 members "perform nearly every job in both plants," including "evisceration, deboning, and hanging." Whiteley Decl. ¶ 6; *see also* Adams Decl. (describing job as a spreader at the Robards plant); Lewis Decl. (describing evisceration line work at Corydon plant).

Plaintiff UFCW Local 1529 represents approximately 800 workers at the Wayne Farms plant in Laurel, Mississippi, which received a line-speed waiver under the 2018 Waiver Policy in April 2020. Compl. (ECF 1) ¶ 10; James Decl. ¶ 3. UFCW Local 1529 "represents most of the

poultry workers on the line at the Laurel plant," and its members "perform every production job including live hang, re-hang, evisceration and de-boning, which requires the use of sharp knives." James Decl. ¶ 5; *see also* Frank Decl. (describing job on the debone line at the Laurel plant).

Plaintiff UFCW Local 1995 represents approximately 600 workers at the Wayne Farms plant in Albertville, Alabama, which received a line-speed waiver in April 2020. Compl. (ECF 1) ¶ 11; Margarito Decl. ¶ 3. UFCW Local 1995 members at the Wayne Farms plant "work in all aspects of production including evisceration, hang/rehang and deboning," and they "perform repetitive, dangerous tasks, including using sharp knives to separate chicken parts." Margarito Decl. ¶ 6; *see also* Ramirez Decl. ¶ 5 (describing deboning work at the Wayne Farms plant).

Plaintiff UFCW Local 2008 represents 400 workers at the Wayne Farms plant in Danville, Arkansas, which received a line speed waiver in September 2019; and 500 workers in the Tyson Foods plants in Dardanelle, Arkansas, and 1000 workers in the Tysons Foods plant in Noel, Missouri, both of which received a line-speed waiver in September 2019. Compl. (ECF 1) ¶ 12; Hill Decl. ¶¶ 3, 6; Curtis Decl. (describing job as a trimmer and a sorter at the Danville plant); Ketcherside Decl. (describing live hang job at the Dardanelle plant).

Plaintiff Retail, Wholesale and Department Store Union – Mid South Council (Mid-South) represents approximately 1000 workers in the Wayne Farms plants in Jack, Alabama, which received a line speed waiver in September 2019; and approximately 1000 workers at the Wayne Farms plant in Decatur, Alabama; and approximately 800 workers at the Tyson Foods plant in Forest, Mississippi, both of which received line speed waivers in April 2020. Compl. (ECF 1) ¶ 13; Hadley Decl. ¶ 3. Mid-South members constitute "most of the poultry workers on the lines at these plants" and "perform repetitive, dangerous tasks, including live hang, re-hang, evisceration,

11

and deboning," often using sharp knives. Hadley Decl. ¶ 5; *see also* Foster Decl. (describing job as an evisceration worker at the Jack plant).

Plaintiff United Food and Commercial Workers International Union is an international labor organization representing approximately 70,600 poultry processing workers. Compl. (ECF 1) ¶ 14. Members of UFCW Local 227, UFCW Local 1529, UFCW Local 1995, UFCW Local 2008, and Mid-South are also members of UFCW. *Id.*

## LEGAL STANDARDS

USDA has moved to dismiss the complaint for lack of standing, pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim, pursuant to Rule 12(b)(6). To survive a motion to dismiss for lack of standing under Rule 12(b)(1), "plaintiffs are required only to state a *plausible* claim that each of the standing elements is present." *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (internal quotation marks omitted). A court must accept all of the factual allegations in the complaint as true, *id.* at 627, and must assume that "plaintiffs will prevail on the merits of their claim," *id.* at 629. At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct" are sufficient to meet a plaintiff's burden. *Frank v. Autovest, LLC*, 961 F.3d 1185, 1187 (D.C. Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)); *see also In re U.S. Office of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 54 (D.C. Cir. 2019) ("The question at this early juncture in the litigation is whether plaintiffs have plausibly alleged standing," not whether the plaintiffs have "establish[ed] each element of standing by a preponderance of the evidence."). Beyond the factual allegations of the complaint, the court also "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). Such materials include "declarations … 'to supply ... further particularized allegations of fact deemed supportive of plaintiff's standing.'" *Ctr. for Biological Diversity v.*

*Bernhardt*, 442 F. Supp. 3d 97, 109 (D.D.C. 2020) (quoting *Warth v. Seldin*, 422 U.S. 490, 502 (1975)).

In assessing a motion to dismiss under Rule 12(b)(6), "a court must accept as true all of the allegations contained in a complaint" and determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Pub. Citizen Health Res. Grp. v. Acosta*, 363 F. Supp. 3d 1, 10 (D.D.C. 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted)).

## ARGUMENT

### I.   UFCW has adequately established Article III standing.

To have standing to bring suit, a plaintiff must "present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (citation omitted). A plaintiff satisfies the injury-in-fact requirement—including the "imminence" requirement—when an agency takes action that "causes an individual or individual members of an organization to face an increase in the risk of harm that is 'substantial,' and [when] the ultimate risk of harm is also 'substantial.'" *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1296 (D.C. Cir. 2007); *see also Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2016) (observing that "the risk of real harm" can "satisfy the requirement of concreteness"). A risk is substantial where it is "non-trivial" and "sufficient to take a suit out of the category of the hypothetical." *Nat. Res. Def. Council v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006) (internal quotation marks and ellipses omitted); *see also Sierra Club v. EPA*, 754 F.3d 995, 1001 (D.C. Cir. 2014) (same).

13

Here, USDA only challenges injury in fact.[2] UFCW has alleged that members who work on poultry processing lines are harmed by USDA's decision to grant waivers that enable their employers to increase their line speed by 25 percent, which substantially increases the risk of physical injuries. The injury to UFCW's members is grounded in two basic propositions: (1) scientific experts agree that faster line speeds contribute to a dangerous pace of work for workers on the poultry lines, and (2) raising the regulatory line-speed limit by 25 percent substantially increases the risk that UFCW members will be injured. The allegations in the complaint, the additional evidence submitted with this opposition, as well as "experience and common sense," demonstrate that the "risk here is substantial." *Attias*, 865 F.3d at 628 (internal quotation marks omitted).

**A.** "[T]he proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm … as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." *Id.* at 627 (internal quotation marks omitted). Contrary to USDA's contention (USDA Mem. (ECF 9) at 14), an injury may be sufficiently imminent for standing purposes even if it is not "certainly impending." As the D.C. Circuit recently explained, "a plaintiff is not limited to establishing injury-in-fact by showing that a harm is 'certainly impending'; it may instead show a 'substantial risk' that the anticipated harm will occur." *New York Republican State Comm. v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019); *see also Dep't of Commerce v. New York*, 139 S. Ct. at

---

[2] USDA correctly does not contest causation and redressability. The 2018 Waiver Policy and the waivers granted to plants at which UFCW members work caused the injury described above by permitting those plants to increase their line speeds. *See Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 248 (D.C. Cir. 2013). That injury is redressable by this Court because a decision setting aside USDA's actions would require those plants to adhere to the 140 bpm maximum line speed limit set forth in FSIS regulations.

2565 (same); *Attias*, 865 F.3d at 627–28 (same). To satisfy the substantial-risk standard, a "single inference" that the agency's action will result in "the increased risk of at least some harm" is sufficient to make the injury "substantial and not speculative." *New York Republican State Comm.*, 927 F.3d at 505.

The "ultimate alleged harm" here is physical injury, which is a "concrete and particularized injury" for standing purposes. *Pub. Citizen*, 489 F.3d at 1298; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 915 (D.C. Cir. 2015) (same). As UFCW has alleged, poultry workers suffer from traumatic injuries ranging from death and amputations to contusions and lacerations, and from musculoskeletal disorders such as carpal tunnel syndrome, at rates far above those experienced by the average industrial worker. Compl. (ECF 1) ¶¶ 19–20. Further, UFCW has alleged that a major reason for the high injury rates is the pace at which workers on the line must work to keep up with the speed of the poultry line. *Id*. ¶¶ 22–24. The faster workers must operate their knives and saws, or perform other manual labor to process poultry, the greater the risk of mishaps that lead to acute injuries, and the higher the risk of musculoskeletal disorders as a result of the increase in repetitive motions that workers have to make. *Id.*

By enabling plants to increase their line speeds from the prior limit of 140 bpm to 175 bpm, USDA has substantially increased the risk of harm to workers that UFCW represents. *Id.* ¶ 73. Recipients of waivers are required to "routinely … operate at least one line at speeds above 140 bpm on average." 2018 Waiver Notice, 83 Fed. Reg. at 49,051. As USDA itself has previously recognized, "[i]ncreasing line speed in processing, without changing other factors, could result in an increase of work pace for establishment employees, and increasing work pace among establishment employees, without taking appropriate mitigation actions, could increase risk of injuries and illnesses among establishment employees." Final Rule, 79 Fed. Reg. at 49,598. Yet,

15

while USDA authorized plants to increase their line speeds, USDA took no steps to assure that plants adopt any appropriate mitigation actions to protect worker safety. Compl. ¶¶ 51, 72. In these circumstances, "the increased risk of at least some harm" from the agency's waiver of its line speed limits is "substantial and not speculative." *New York Republican State Comm.*, 927 F3d at 505.

**B.** In arguing otherwise, USDA attempts to shoehorn this case into the factual scenario addressed in the D.C. Circuit's decision in *Food & Water Watch*. USDA Mem. (ECF 9) at 15–16, 18. In *Food & Water Watch*, consumers of poultry challenged USDA's final rule adopting NPIS, arguing that NPIS increased their risk of foodborne illness. 808 F.3d at 914. The D.C. Circuit concluded that the plaintiffs had failed to demonstrate an injury-in-fact because they did not "plausibly allege that the NPIS substantially increases the risk of foodborne illness *when compared to existing inspection systems*." *Id*. at 915 (emphasis added); *see also id.* ("they fail to allege that the NPIS as a whole will produce significantly more adulterated, unwholesome chicken compared to the existing inspection systems"); *id*. at 916 ("Notably, these allegations do not allege that these results are *worse* than what plants do under existing inspection systems"); *id.* at 917 ("they do not allege that the risk of unwholesome, adulterated poultry is higher under the NPIS as a whole than the existing inspection systems").

By contrast, UFCW has specifically alleged and provided evidence that the poultry plants operating up to 175 bpm increases the threat to worker health and safety compared to plants operating at 140 bpm. "The faster the pace at which the production line moves, the less able workers may be to perform tasks needed for safety." Joshi Decl., Ex. H (2005 GAO Report), at 31; *see also*, *e.g.*, Lewis Decl. ¶¶ 9–13 (describing effects of line speed increase at Corydon plant). And "[l]ine speed affects the periodicity of repetitive and forceful movements, which are the key causes of musculoskeletal disorders." Joshi Dec., Ex. I (NIOSH Letter), at 2–3. *See also supra* pp.

4–6. Those allegations and evidence, along with "experience and common sense," *Food & Water Watch*, 808 F.3d at 917, plausibly support the inference that "[i]ncreasing line speeds, in the absence of effective ergonomic programs, will further increase the risk of [such disorders] and other injuries and illnesses for poultry workers." Fagan Decl., Ex. B, at 7.

USDA focuses on the NIOSH Letter, cited in the complaint (at ¶ 23), which USDA contends drew "no conclusion" about "the effect of line speed changes on worker health." USDA Mem. (ECF 9) at 17 (quoting Joshi Decl., Ex. I (NIOSH Letter), at 3). But USDA quotes that language out of context. In that letter, although NIOSH advised FSIS not to draw any conclusions from one particular Health Hazard Evaluation (HHE) "regarding the effect of line speed changes on worker health," that statement was made in the context of *criticizing* FSIS for interpreting the HHE as evidence that line speed did *not* harm worker safety. *Id.* at 3. The NIOSH Letter stated in no uncertain terms that "[l]ine speed affects the periodicity of repetitive and forceful movements, which are the key causes of musculoskeletal disorders." *See, e.g.*, Joshi Decl., Ex. I (NIOSH Letter), at 2–3. The HHE, moreover, recommended that plants "[d]esign job tasks so that they are below the ACGIH [threshold limits] to minimize the risk for developing carpal tunnel syndrome, which could include using the sixth cone line and *reducing the speed of all cone lines to reduce repetition*." Joshi Decl., Ex. P (Musolin Study), at 27 (emphasis added); Fagan Dec., Ex. B, at 3 (explaining ACGIH standards for ergonomic risk). NIOSH has made similar recommendations to poultry plants since 1988. *See supra* p. 5; *see also* Joshi Decl., Ex. Q (Ramsey Study), at 20 (offering same recommendation to another poultry plant). These recommendations reflect clearly that NIOSH believes that faster line speeds have a deleterious effect on worker health and safety.

Citing *Food & Water Watch*, USDA also argues that "Plaintiffs here have failed to account for changes to staffing levels, layout, and equipment, which the NIOSH letter shows can keep the

overall level of exposure to repetitive and forceful motions for each worker steady." USDA Mem. (ECF 9) at 18. Unlike the plaintiffs in *Food & Water Watch*, however, UFCW has taken account of the 2018 Waiver Program "as a whole." *Food & Water Watch*, 808 F.3d at 915. In particular, UFCW's allegations of injury are grounded in FSIS's decision to authorize plants to operate at faster line speeds without requiring them to ensure that workers are protected from the harmful effects caused by faster line speeds, such as by making "changes to staffing levels, layout, and equipment." USDA Mem. (ECF 9) at 18. UFCW's standing is not negated by the hope that the plants will voluntarily take steps to alleviate the substantial risk of harm that USDA has created. To the contrary, when an agency authorizes a third party to act in ways that previously would have been unlawful, the general rule is a plaintiff injured by the newly authorized action has standing to challenge the agency's action. *See*, *e.g.*, *Am. Trucking Ass'ns, Inc.*, 724 F.3d at 248; *Renal Physicians Ass'n v. U.S. Dep't of Health & Human Servs.*, 489 F.3d 1267, 1275 (D.C. Cir. 2007).

USDA's assertion that this Court cannot determine whether the increased risk to UFCW members is substantial because the complaint does not "specify how much higher" the risk is likewise lacks merit. USDA Mem. (ECF 9) at 16. The D.C. Circuit has "refused to require a quantitative analysis in order to establish standing in increased risk-of-harm cases." *Food & Water Watch*, 808 F.3d at 917. Thus, in *Attias*, the D.C. Circuit found a substantial risk of harm of identity theft as a result of a data breach without undertaking any quantitative analysis. It was enough that "a substantial risk of harm exists already, simply by virtue of the hack and the nature of the data that the plaintiffs allege was taken." 865 F.3d at 629; *see also New York Republican State Comm. v. SEC*, 927 F.3d at 504 (finding an "increased risk of some harm" to be "substantial and not speculative" without quantifying the risk).

USDA also argues that UFCW has not alleged that "any worker has suffered, or imminently will suffer any concrete physical injury as the result of a waiver allowing for faster line speeds." USDA Mem. (ECF 9) at 13, 15–16. UFCW has alleged, however, that specific workers on the poultry line at plants that have received line speed waivers are exposed to an increased risk of injury, and, as explained, the scientific evidence—and FSIS itself—have consistently recognized the connection between line speed and worker safety. *See supra* pp. 4–6, 7–8. While it is impossible to show any particular injury is exclusively caused by a particular increase in line speed, "[t]he law does not require Plaintiffs to submit a randomized control trial or other rigorous statistical analysis demonstrating beyond peradventure that" people are subject to increased risk of harm. *New York v. Trump*, No. 20-CV-5770 (RCW) (PWH) (JMF), 2020 WL 5422959, at *16 (S.D.N.Y. Sept. 10, 2020).

Finally, USDA argues that regardless of how much the increase in line speed elevates the risk to workers, UFCW lacks standing because the UFCW made "no effort to allege … that the overall risk of injury at 175 bpm is *substantial*." USDA Mem. (ECF 9) at 15. Because "health injuries often are purely probabilistic," the D.C. Circuit has required a plaintiff to allege a "substantial probability" of injury, which simply requires that the risk be "'non-trivial'" and not "hypothetical." *Nat. Res. Def. Council*, 464 F.3d at 6 (internal quotation marks omitted) (holding that a risk is "sufficient to support standing" where "two to four of NRDC's nearly half a million members will develop cancer"); *see also Louisiana Envtl. Action Network v. EPA*, 172 F.3d 65, 68 (D.C. Cir. 1999) ("Even if the variance-to-remediation ratio is fairly low, the amount of such activities creates a very 'substantial probability' that some variances will be granted, increasing risk to LEAN members near the Carlyss site."). Here, UFCW expressly made an allegation of substantial harm to its members. *See* Compl. (ECF 1) ¶ 73.

19

**II.  UFCW was not required to identify an individual member with Article III standing in the complaint.**

An association such as a union may have standing to maintain a federal action "to redress its members' injuries, even without a showing of injury to the association itself." *United Food & Commercial Workers Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996) . A plaintiff has associational standing where "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 553 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). UFCW has satisfied all three of these elements.

First, as explained above, UFCW members who work on the poultry line have standing to sue in their own right because they have suffered the requisite injury-in-fact. Second, that UFCW seeks to protect the health and safety of workers it represents is germane to the organization's purpose as a labor union. Third, the APA claims at issue do not require the participation of UFCW members because the decision on the merits will be based on the administrative record. *See generally United Food & Commercial Workers*, 517 U.S. at 553. Aside from its argument that poultry workers have not suffered injury-in-fact, USDA does not seriously question that the well-established test for associational standing has been met.

Instead, USDA contends (at 12–13) that the complaint should be dismissed because UFCW did not identify in its complaint one of the thousands of workers on the poultry lines at ten plants at issue in this case. In connection with this opposition, UFCW has submitted declarations from workers and union officials demonstrating that these workers exist. *See* Adams Decl. (worker in Local 227 at Robards plant); Lewis Decl. (worker in Local 227 at Corydon plant); Whiteley Decl. (official with Local 227); Frank Decl. (worker in Local 1529 at Laurel plant); James Decl. (union

representative with Local 1529 at Laurel plant); Ramirez Decl. (worker in Local 1995 at Albertville plant); Margarito Decl. (union representative with Local 1995); Curtis Decl. (worker with Local 2008 at Danville plant); Ketcherside Decl. (worker with Local 2008 at Dardanelle plant); Hill Decl. (official with Local 2008); Foster Decl. (worker at Decatur plant and official with Mid-South); Hadley Decl. (president of Mid-South). These declarations confirm that the increased risk of injury as a result of the line speed increase authorized by FSIS affects real UFCW members.

In any event, USDA is mistaken in contending that the complaint must identify specific members on whose behalf an association brings suit. "[A]llegations of the complaint are generally taken as true for purposes of a motion to dismiss." *Washington All. of Tech. Workers v. United States Dep't of Homeland Sec.*, 892 F.3d 332, 338–39 (D.C. Cir. 2018) (quoting *Hughes v. Rowe*, 449 U.S. 5, 10 (1980)). UFCW's allegations in the complaint that it has members who work on poultry lines at plants that have received line speed waivers is thus sufficient to support the inference that it meets the test for associational standing. *See Doe v. Stincer*, 175 F.3d 879, 884 (11th Cir. 1999). ("[U]nder Article III's established doctrines of representational standing, we have never held that a party suing as a representative must specifically *name* the individual on whose behalf the suit is brought."). And courts routinely find that plaintiffs have associational standing when, like here, plaintiffs aver in a complaint that they represent unidentified members who would have standing. *See*, *e.g.*, *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 61 (D.D.C. 2019) (holding that plaintiffs had standing based on declarations submitted after the complaint, where the complaint generally averred that unidentified members had standing); *Chesapeake Climate Action Network v. Exp.-Imp. Bank of the United States*, 78 F. Supp. 3d 208, 217 (D.D.C. 2015); *Nat'l Treasury Employees Union v. Whipple*, 636 F. Supp. 2d 63, 72 (D.D.C. 2009).

21

The two cases that USDA cites do not hold that an associational plaintiff must always name a specific member in its complaint. *See* USDA Mem. (ECF 9) at 12 (citing *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 815 (D.C. Cir. 2006), and *Chamber of Commerce. v. EPA*, 642 F.3d 192, 199–200 (D.C. Cir. 2011)). Both of those cases involved direct review of agency action in the court of appeals. Therefore, no complaint was filed in those cases, and neither speaks to the specificity of allegations that must be made in a complaint. Rather, those cases turned on the inadequacy of the evidence. In *American Chemistry Council*, the "petitioners submitted no affidavits or other forms of evidence" on injured members, but "claimed only in a most general fashion" that their members would suffer injury. 468 F.3d at 819. In that context, the court stated that "[i]t is not enough to show … that there is a substantial likelihood that at least one member may have suffered an injury-in-fact," but rather, "[a]t the very least, the identity of the party suffering an injury in fact must be firmly established." *Id.* at 820. *Chamber of Commerce* stands for a similar principle. *See* 642 F.3d at 201 (faulting petitioner for "not identif[ying] a single member who was or would be injured by EPA's waiver decision").

In this case, by contrast, UFCW does not claim a "substantial likelihood" that at least one of its members has suffered injury-in-fact. Rather, UFCW alleges that its members will suffer *certain* injury-in-fact due to the increased risk of harm that faster line speeds create for thousands of poultry line workers. Because it is a "certainty" that these union members suffer an increased risk of harm stemming from the FSIS waiver policy, "plaintiffs need not be able to identify particular employees who will be harmed … to maintain such action." *Am. Fed'n of Gov't Employees v. Office of Pers. Mgmt.*, 618 F. Supp. 2d 1254, 1259 (D.D.C. 1985), *aff'd,* 782 F.2d 278 (D.C. Cir. 1986); *see also Nat. Res. Def. Council*, 464 F.3d at 6 (finding standing without identification of specific members who would be at increased risk of cancer). In these

circumstances, granting USDA's motion—and thereby requiring UFCW to amend its complaint to add the names of the workers who have submitted declarations in support of this opposition— would serve no useful purpose, and is not required by the case law.

## III.  UFCW falls with the zone of interests of the statutory scheme.

USDA also moves to dismiss on the grounds that UFCW is outside of the zone of interests of the statutory scheme. "The zone-of-interests standard is particularly generous as applied to plaintiffs who bring suit under the APA, in light of the need to preserve the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Am. Bar Ass'n v. United States Dep't of Educ.*, 370 F. Supp. 3d 1, 18 (D.D.C. 2019) (internal quotation marks and brackets omitted). This generous test is in keeping with Congress' "'evident intent' when enacting the APA to make agency action presumptively reviewable." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012) ((quoting *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399–400 (1987)). Under this "lenient approach," the zone-of-interests test "forecloses suit *only* when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." *Id.* (emphasis added). The zone-of-interests test does not require "an indication of congressional purpose to benefit the would-be plaintiff," *Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 492 (1998), and "the benefit of the doubt goes to the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

As other courts have found when holding that workers' organizations may challenge FSIS regulations, the safety of those meatpacking workers who process food for human consumption is integral to the food safety regulatory regime, and thus workers like UFCW's members easily clear

the "not especially demanding" hurdle of the zone-of-interests test. *See United Food & Com.
Workers Union, Local No. 663 v. United States Dep't of Agric.*, 451 F. Supp. 3d 1040, 1053 (D.
Minn. Apr. 1, 2020) (holding that swine workers fell within the zone of interests of the Federal
Meat Inspection Act because "[i]f the conditions for the employees are not safe and sanitary, the
safety of the food products they prepare is also at risk."); *Levine v. Johanns*, No. C 05-04764 MHP,
2006 WL 8441742, at \*13 (N.D. Cal. Sept. 6, 2006).

These cases reflect the principle that, when the concerns animating a plaintiff are "of the
sort that [the agency] surely will have 'in mind' when exercising its authority" pursuant to statute,
that "*alone* is enough to show that [the plaintiff's] asserted interests at least arguably fall within
the zone-of-interests protected by" the statute in question. *Indian River Cty. v. Dep't of Transp.*,
945 F.3d 515, 529 (D.C. Cir. 2019). FSIS does keep worker safety "in mind" when exercising its
authority under the PPIA. For example, when FSIS adopted its current 140 bpm line speed
maximum, it "recognize[d] that evaluation of the effects of line speed on food safety should include
the effects of line speed on establishment employee safety." Proposed Rule, 77 Fed. Reg. at 4423;
*see also supra* pp. 7–8. In fact, FSIS promulgated rules in the Code of Federal Regulations to
address worker safety concerns by requiring plants to adopt a worker safety monitoring program
and to comply with worker safety laws. *See*, *e.g.*, Final Rule, 79 Fed. Reg. at 46,600. FSIS has
considered worker safety when issuing regulations, showing that USDA recognizes the link
between food safety and the safety of workers who prepare food for human consumption. *See*, *e.g.*,
Final Rule, 79 Fed. Reg. at 46,600 (addressing worker safety concerns by requiring plants to adopt
a worker safety monitoring program and to comply with worker safety laws); Pathogen Reduction;
Hazard Analysis and Critical Control Point (HACCP) Systems, 61 Fed. Reg. 38,806, 38,845 (July
25, 1996) (requesting comments on whether proposed poultry safety protocols create worker safety

concerns); Pathogen Reduction; Hazard Analysis and Critical Control Point (HACCP) Systems—

Sample Collection— Technical Amendments and Corrections: Direct Final Rule, 62 Fed. Reg.

61,007, 61,007 (Nov. 14, 1997) (explaining a change to the rule was made "[i]n response to worker

safety concerns"); Irradiation of Meat Food Products, 64 Fed. Reg. 72,150, 72,152 (Dec. 23, 1999)

(explaining that FSIS concluded new rules would not post a significant risk to workers);

Memorandum of Understanding Between OSHA and FSIS (Feb. 4, 1994),

https://www.osha.gov/laws-regs/mou/1994-02-04 (establishing procedures to train FSIS poultry

inspectors to better "recognize and refer to FSIS headquarters those instances where plant

employees are exposed to workplace hazards.").

Although USDA devotes much space explaining that the PPIA was enacted primarily to

promote food safety rather than worker safety, USDA Mem. (ECF 9) at 22, the legislative history

shows that Congress understood that the statute would promote worker safety as well. *See Poultry

Products Inspection Act: Hearing on S. 313, S. 645, and S. 1128 Before the S. Comm. on

Agriculture and Forestry*, 85th Cong. 117 (1957) (testimony of then-Deputy FDA Commissioner

John L. Harvey urging Congress to pass the bill to "protect consumers … and plant workers and

poultry handlers from exposure to disease."). Even if workers are not the "intended beneficiaries"

of the PPIA, their interests are not "so marginally related to or inconsistent with the purposes

implicit in the statute" that they fall outside its zone of interests. *Lexmark Int'l, Inc*. 572 U.S. at

130 (internal quotation marks omitted).

USDA relies on *Twin Rivers Paper Co. v. SEC*, 934 F.3d 607 (D.C. Cir. 2019), to argue

that UFCW's interests do not "'systematically coincide' with those of poultry product consumers."

USDA Mem. (ECF 9) at 23. In *Twin Rivers*, plaintiff paper companies sued to block an SEC rule

that allowed investment companies to post shareholder reports online rather than mailing hard

copies to shareholders. 934 F.3d at 611. The court held that the companies' interest fell outside of the zone of interests of the securities laws because of "systematic *mis*alignment" between the plaintiffs' goal of selling paper and the statutory goals of protecting shareholders, *id.* at 618, with "the conflict between the interests of paper sellers and those of shareholders … likely to increase over time," *id.* at 617. Citing *Twin Rivers*, USDA contends that UFCW's concerns about line speed fall outside the zone of interests because those concerns would apply whether the effect on food safety is "good, bad, or indifferent." USDA Mem. (ECF 9) at 23 (quoting *Twin Rivers*, 934 F.3d at 671 (internal quotation marks omitted). But USDA identifies no systemic misalignment between the worker safety interests advanced by UFCW and food safety, and USDA fails to explain how maintaining a line speed of 140 bpm could have a "bad" effect on food safety. Because UFCW's claims are not "more likely to frustrate than further the statutory objective," *Twin Rivers*, 934 F.3d at 616, USDA's zone of interest argument fails.

## CONCLUSION

The motion to dismiss should be denied.

Dated: November 13, 2020                    Respectfully submitted,

/s/ Nandan M. Joshi
Nandan M. Joshi (DC Bar No. 456750)
Adam R. Pulver (DC Bar. No. 1020475)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000

Sarai K. King
United Food & Commercial Workers
International Union, AFL-CIO, CLC
1775 K Street, NW
Washington, DC 20006-1598
(202) 223-3111